**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

MITSUBISHI HITACHI POWER SYSTEMS
AMERICAS, INC., n/k/a MITSUBISHI
POWER AMERICAS, INC.

      Plaintiff,                          CASE NO.  6:20-cv-1845-Orl-78DCI

      vs.

SIEMENS ENERGY, INC., JOHN DOE 1,
individually, and JOHN DOE 2,
individually,

      Defendants.

_____/

**PLAINTIFF'S UNOPPOSED MOTION TO SEAL CERTAIN
EXHIBITS FOR EVIDENTIARY HEARING PURSUANT TO
18 U.S.C §1835(a), (b) AND SUPPORTING
<u>MEMORANDUM OF LAW</u>**

Plaintiff Mitsubishi Hitachi Power Systems Americas, Inc., n/k/a Mitsubishi Power Americas, Inc. ("Mitsubishi"), pursuant to Local Rule 1.09(b) and 18 U.S.C.1835(a),(b), files this Unopposed Motion to Seal Certain Exhibits to be admitted at the December 3, 2020 evidentiary hearing on its Motion for Preliminary Injunction and in support thereof states as follows:

**<u>SUMMARY OF ARGUMENT</u>**

Mitsubishi requests that certain exhibits to be used at the December 3, 2020 evidentiary, as more particularly described in this Motion, be sealed.  Sealing of the exhibits is authorized pursuant to Local Rue 1.09(b) and 18 USC § 1835(a) and (b) of the Defend Trade Secrets Act as the exhibits at issue include confidential and proprietary trade secret information.  Mitsubishi's privacy interest in the Trade Secret documents outweighs any public right of access.  Mitsubishi derives economic value from the fact that its Trade Secrets are not generally known to others.  The availability of Mitsubishi's confidential information and Trade Secrets would give competitors an

unfair economic advantage in developing, marketing, manufacturing, and selling competitive industrial power generation products and providing service of these products. Therefore it is imperative that the documents be sealed to prevent such harm.

## I.   BACKGROUND

1.      This case arises from Siemens' acknowledged misappropriation and sharing of Mitsubishi's Trade Secrets. (Docs. 1, 2, 27, 34).

2.      Mitsubishi has filed a Verified Complaint against Siemens Energy, Inc. ("Siemens"), John Doe 1, and John Doe 2, pursuant to the 18 U.S.C §1836(b), *et. seq.* known as the Defend Trade Secrets Act ("DTSA"). (Doc. 1)("Complaint").

3.      The Complaint consists of two counts under the DTSA: (1) action for temporary restraining order, temporary injunction, and permanent injunction; and (2) an action for damages.

4.      The gravamen of the Complaint is that Mitsubishi submitted substantial Trade Secret Information to Dominion Energy, Inc. ("Dominion") as part of Mitsubishi's submitting of a proposal to supply and deliver combustion turbine and generator packages, related technical advisory services and a long term service agreement to the Virginia electric and Power Company, a Dominion company (the "Peakers Project"). (Doc. 1, ¶ 22, 26)

5.      A "peaker" is a power plant that operates generally only when there is a high demand for electricity, known as peak demand. (Doc. 1 ¶ 23)

6.      Specifically, in connection with its proposal for the Peakers Project, Mitsubishi sent Dominion pricing information, engineering specifications, economic data, analysis and evaluations of gas turbine temperatures, fuel consumption, heat rate, exhaust flow, and output, as well as patterns, plans, designs, drawings, specifications, weights, dimensions, bills of material, equipment test results, discounts, performance data, calculations, and other know-how—all of which constituted Trade Secrets. (Doc. 1, ¶ 26)

7.     The Trade Secrets provided as part of the Peakers Project bid submissions contain information not limited in applicability to only the Peakers Project specifically or peakers in general but also to Mitsubishi's business model, pricing, and specifications for specific equipment, equipment upgrades, techniques and long term services offered which will have impact to bids for such equipment and services on future projects whether offered on peaker or base load projects. (Doc. 1, ¶ 28)

8.     Per the Complaint, on August 28, 2020, *i.e.,* over one year after Siemens was awarded the Peakers Project, Siemens notified Mitsubishi that a Dominion employee had disclosed Mitsubishi's Trade Secrets to Siemens.  (Doc. 1, ¶ 29)

9.     The Complaint seeks temporary and permanent injunctive relief pursuant to the DTSA (1) enjoining the Defendants from further use of or disclosing Mitsubishi's confidential information and any subsequent documents which contain such information or derivations thereof, which information, if it remains within Siemens custody, possession, and control, will cause detrimental harm to Mitsubishi in the form of lost profits, loss of business opportunities, loss of trade secrets, and loss of goodwill with current and prospective clients; (2) compelling the immediate return of the Mitsubishi confidential information and certification that none of it remains with Defendants; and (3) enjoining Siemens from using the Mitsubishi confidential information or derivatives thereof on future project bids.  (Doc. 1, p. 15)

10.     Count II of the Complaint seeks damages under the DTSA.

11.     In connection with the filing of the Complaint Mitsubishi filed a Motion for Preliminary Injunction Under Rule 65 and 18 U.S.C. § 1836(B)(3)(A) seeking preliminary injunctive relief pending the outcome of the Lawsuit: (1) enjoining the Defendants from further use of or disclosing Mitsubishi's confidential information and any subsequent documents which

#80582761_v1

contain such information or derivations thereof, which information, if it remains within Siemens custody, possession, and control, will cause detrimental harm to Mitsubishi in the form of lost profits, loss of business opportunities, loss of trade secrets, and loss of goodwill with current and prospective clients; (2) compelling the immediate return of the Mitsubishi confidential information and certification that none of it remains with Defendants; and (3) enjoining Siemens from using the Mitsubishi confidential information or derivatives thereof on future project bids.  (Doc. 2, p. 19)

12.    Mitsubishi's Motion for Preliminary Injunction is scheduled for an evidentiary hearing on December 3, 2020.  (Doc. 42)

13.    During the evidentiary hearing Mitsubishi intends to submit into evidence several documentary exhibits which discuss or include Mitsubishi's Trade Secret information.   Those exhibits are as follows:

| Ex | Date | File Name | SUMMARY |
|----|------|-----------|---------|
| A | 5/23/19 | Raw Summary Attachment 1 | Chart prepared by Dominion Energy personnel, attached to a 5/23/19 email, summarizing summer capacity (mw), costs/kw, NOx (gas/oil) emissions, CO (gas/oil) emissions, dual fuel option costs, and gas only (LTSA) costs for MHPS's 501GAC and PWPS FT4000 aero engines. The chart also contained information about MHPS competitors. |
| B | 5/23/19 | Raw Summary Attachment 2 | Chart prepared by Dominion Energy personnel, attached to a 5/23/19 email, summarizing the following items for MHPS's 501GAC and PWPS FT4000 aero engines: equipment and shipping costs, NOx (gas/oil) emissions, CO (gas/oil) emissions, options (i.e., backup fuel, wet compression costs, lube oil purifier costs, generator upgrade costs, fire protection system upgrade costs, hot SCR costs), and LTSA to 1st major service cost for 500MW gas only. The chart also contained information about MHPS competitors as well. |
| C | 6/3/19 | Peaker Cost Summary Email Attachment | Chart related to the 2022 SC RFP evaluation prepared by Dominion Energy personnel, attached to a 6/3/19 email, summarizing capacity, initial pricing, and |

| | | | |
|---|---|---|---|
| | | | option costs (i.e., dual fuel costs, evaporation cooling, wet compression, etc.) for MHPS 501GAC Fast engines. The chart also contained information about MHPS competitors. |
| D | 6/13/19 | Service Agreement Attachment | LTSA cost summary sheet for MHPS engines broken down by 2022 Base Cost (2 gas turbines at 1 site) and future (2 sites with 2 GTs/site) costs. The chart includes costs for things like total contract price, additional parts purchase, credit for parts at the end of term, additional fuel oil optional parts, escalation start date and rates. |
| E | 6/13/19 | Summary Email | Email regarding MHPS's proposal for the Kai upgrade as it related to the combustion turbine engine RFP bids<br><br>The email chain included an email from Mark Bissonnette (Senior VP, Service Sales & Marketing, MHPS) to Bill Newsom (MHPS) and Marco Sanchez (MHPS) on 6/13/19 showing combined cycle output and bundled prices for units at Dominion's Warren and Brunswick facilities. |
| F | 6/14/19 | Kai Upgrade Email | Email chain that includes a 2/13/19 email from Craig Malobicky (Sales Manager, MHPS) to Olaf Barth (Dominion Energy), David Anderson (Dominion Energy), and Rizwan James (Dominion Energy) discussing the Kai upgrades including potential performance of Brunswick and Warren plants after upgrade. |

#80582761_v1

| G | | Kai Upgrade Attachment 1 | 11/29/18 presentation from MHPS employees Scott Cloyd (Chief Engineer), Christian Dakin (Senior Product Line Manager), and Craig Malobicky (Sales Manager) entitled "Product & Upgrade Overview M501GAC's Brunswick County/Warren County." |
| H | | Kai Upgrade Attachment 2 | Spreadsheet providing technical data for Kai upgrade including performance inputs/outputs (i.e., temperature, humidity, compressor inlet temperature, barometric pressure, load, gross output, gross heat rate, fuel flow, exhaust temperature, and exhaust flow), post-uprate configuration (Kai), and post-uprate configuration (Kai and Compressor). |
| I | | Kai Upgrade Attachment 3 | 6/6/19 letter from Sean Joshi (VP, Sales & Strategic Ventures, MHPS) to Landon Prentiss (Dominion Energy) clarifying MHPS's original equipment commercial proposal and offering information related to Dominion Energy's Clarifications set #2, question #2. |

6

| J | | Kai Upgrade Attachment 4 | 5/1/19 MHPS "Customer Proposal" for "Dominion-Warren County GAC KAI Turbine Upgrade QTO-19-0711-1." The proposal provided an offer letter, and specific information about the GAC Kai Upgrade (description, scope of supply – GT, function & technical summary, estimated performance benefit, implementation schedule, and pricing). |
|---|---|---|---|
| K | 6/20/19 | CT Evaluation Attachment | Draft June 2019 RFP analysis presentation prepared by Dominion Energy personnel, attached to a 6/20/19 email, providing assumptions about MHPS 501 GAC generators (3x545 mw (1,635 mw)) including overnight installed costs (per kw) and capital expenditures between 2022 and 2024. It also included NPV results ($/kw) for MHPS engines from 2022 to 2024. The presentation also contained information about MHPS competitors. |
| L | 6/20/19 | Revised Offer Email | Email chain including a 6/20/19 email from Sean Joshi (MHPS) to Landon Prentiss (Dominion Energy) attaching MHPS's revised offer for the peaker project. |
| M | | Revised Offer Attachment | 6/20/19 letter from Kent Rockaway (VP, Commercial Operations, MHPS) to Landon Prentiss (Dominion Energy) entitled "2022 CT Project – Revised Commercial Offer" providing details of a new price, and other items, for 6x M501GAC Peaker Gas Turbines and GAC Kai upgrades. |

7

#80582761_v1

14.     The sealing of the exhibits is necessary to protect Mitsubishi's Trade Secrets from public disclosure.  Otherwise Mitsubishi will be subject to the very same harm that it seeks to remedy in the instant lawsuit, *i.e.,* the disclosure of its Trade Secrets to the public including its competitors.

15.     Sealing of the exhibits is authorized pursuant to 18 USC § 1835(a) and (b) of the DTSA.  Under subsection (a) "In any prosecution or other proceeding under this chapter, the court shall enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets . . . ."  Under subsection (b) "The court may not authorize or direct the disclosure of any information the owner asserts to be a trade secret unless the court allows the owner the opportunity to file a submission under seal that describes the interest of the owner in keeping the information confidential."

16.     The exhibits at issue fall within the definition of "trade secret" under the DTSA. The term "trade secret" is defined as follows:

> (3)the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A)the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B)the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;
> 18 U.S.C. § 1839

#80582761_v1

17.     Mitsubishi further notes that as part of the instant litigation, the parties have entered into a Confidentiality Agreement whereby they have agreed that if either party seeks to file any document designated as confidential, that they will seek to file such document under seal.

18.     Therefore, sealing of the document is necessary to protect Mitsubishi's confidential and proprietary Trade Secret Information.

19.     Mitsubishi requests that if the Court grants this Motion, that the documents be sealed indefinitely, subject to further orders as may later be made with respect to confidentiality.

## II.     MEMORANDUM OF LAW

**MITSUBISHI'S EXHIBITS FOR THE EVIDENTIARY HEARING SHOULD BE SEALED BECAUSE THEY INCLUDE TRADE SECRETS.**

Pursuant to Middle District Local Rule 1.09 a party may seek to file under seal documents it wants sealed from public disclosure.  Where, as here, the filing under seal is authorized by statute, Rule 1.09(b) provides the Motion should include:

(i) a citation to the statute, rule, or order authorizing the seal;

(ii) an identification and description of each item submitted for sealing;

(iii) a statement of the proposed duration of the seal; and

(iv) a statement establishing that the items submitted for sealing are within the identified statute, rule, or order the movant cites as authorizing the seal.

As set forth below, the weighing of these factors compel the sealing of the specified exhibits to be introduced at the December 3, 2020 evidentiary hearing.

### A.     Statutory Authority Exists for Sealing the Exhibits

Here, Sealing of the exhibits is authorized pursuant to 18 USC § 1835(a) and (b) of the DTSA.  Under subsection (a) "In any prosecution or other proceeding under this chapter, the court shall enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets . . . ."  Under subsection (b) "The court may not authorize or

direct the disclosure of any information the owner asserts to be a trade secret unless the court allows the owner the opportunity to file a submission under seal that describes the interest of the owner in keeping the information confidential."

### B.   Identification and Description of Each Item Submitted for Sealing

Here the exhibits at issue are the following:

| Ex | Date | File Name | SUMMARY |
|---|---|---|---|
| A | 5/23/19 | Raw Summary Attachment 1 | Chart prepared by Dominion Energy personnel, attached to a 5/23/19 email, summarizing summer capacity (mw), costs/kw, NOx (gas/oil) emissions, CO (gas/oil) emissions, dual fuel option costs, and gas only (LTSA) costs for MHPS's 501GAC and PWPS FT4000 aero engines. The chart also contained information about MHPS competitors. |
| B | 5/23/19 | Raw Summary Attachment 2 | Chart prepared by Dominion Energy personnel, attached to a 5/23/19 email, summarizing the following items for MHPS's 501GAC and PWPS FT4000 aero engines: equipment and shipping costs, NOx (gas/oil) emissions, CO (gas/oil) emissions, options (i.e., backup fuel, wet compression costs, lube oil purifier costs, generator upgrade costs, fire protection system upgrade costs, hot SCR costs), and LTSA to 1st major service cost for 500MW gas only. The chart also contained information about MHPS competitors as well. |
| C | 6/3/19 | Peaker Cost Summary Email Attachment | Chart related to the 2022 SC RFP evaluation prepared by Dominion Energy personnel, attached to a 6/3/19 email, summarizing capacity, initial pricing, and option costs (i.e., dual fuel costs, evaporation cooling, wet compression, etc.) for MHPS 501GAC Fast engines. The chart also contained information about MHPS competitors. |
| D | 6/13/19 | Service Agreement Attachment | LTSA cost summary sheet for MHPS engines broken down by 2022 Base Cost (2 gas turbines at 1 site) and future (2 sites with 2 GTs/site) costs. The chart includes costs for things like total contract price, additional parts purchase, credit for parts at the end of term, additional fuel oil optional parts, escalation start date and rates. |

#80582761_v1

| | | | |
|---|---|---|---|
| E | 6/13/19 | Summary Email | Email regarding MHPS's proposal for the Kai upgrade as it related to the combustion turbine engine RFP bids<br><br>The email chain included an email from Mark Bissonnette (Senior VP, Service Sales & Marketing, MHPS) to Bill Newsom (MHPS) and Marco Sanchez (MHPS) on 6/13/19 showing combined cycle output and bundled prices for units at Dominion's Warren and Brunswick facilities. |
| F | 6/14/19 | Kai Upgrade Email | Email chain that includes a 2/13/19 email from Craig Malobicky (Sales Manager, MHPS) to Olaf Barth (Dominion Energy), David Anderson (Dominion Energy), and Rizwan James (Dominion Energy) discussing the Kai upgrades including potential performance of Brunswick and Warren plants after upgrade. |
| G | | Kai Upgrade Attachment 1 | 11/29/18 presentation from MHPS employees Scott Cloyd (Chief Engineer), Christian Dakin (Senior Product Line Manager), and Craig Malobicky (Sales Manager) entitled "Product & Upgrade Overview M501GAC's Brunswick County/Warren County." |

| H | | Kai Upgrade Attachment 2 | Spreadsheet providing technical data for Kai upgrade including performance inputs/outputs (i.e., temperature, humidity, compressor inlet temperature, barometric pressure, load, gross output, gross heat rate, fuel flow, exhaust temperature, and exhaust flow), post-uprate configuration (Kai), and post-uprate configuration (Kai and Compressor). |
| I | | Kai Upgrade Attachment 3 | 6/6/19 letter from Sean Joshi (VP, Sales & Strategic Ventures, MHPS) to Landon Prentiss (Dominion Energy) clarifying MHPS's original equipment commercial proposal and offering information related to Dominion Energy's Clarifications set #2, question #2. |
| J | | Kai Upgrade Attachment 4 | 5/1/19 MHPS "Customer Proposal" for "Dominion-Warren County GAC KAI Turbine Upgrade QTO-19-0711-1." The proposal provided an offer letter, and specific information about the GAC Kai Upgrade (description, scope of supply – GT, function & technical summary, estimated performance benefit, implementation schedule, and pricing). |

#80582761_v1

| K | 6/20/19 | CT Evaluation Attachment | Draft June 2019 RFP analysis presentation prepared by Dominion Energy personnel, attached to a 6/20/19 email, providing assumptions about MHPS 501 GAC generators (3x545 mw (1,635 mw)) including overnight installed costs (per kw) and capital expenditures between 2022 and 2024. It also included NPV results ($/kw) for MHPS engines from 2022 to 2024. The presentation also contained information about MHPS competitors. |
| L | 6/20/19 | Revised Offer Email | Email chain including a 6/20/19 email from Sean Joshi (MHPS) to Landon Prentiss (Dominion Energy) attaching MHPS's revised offer for the peaker project. |
| M | | Revised Offer Attachment | 6/20/19 letter from Kent Rockaway (VP, Commercial Operations, MHPS) to Landon Prentiss (Dominion Energy) entitled "2022 CT Project – Revised Commercial Offer" providing details of a new price, and other items, for 6x M501GAC Peaker Gas Turbines and GAC Kai upgrades. |

In addition to the Mitsubishi documents that are the primary subject of this Motion, Mitsubishi anticipates that it may seek to introduce certain transmittal Siemens transmittal emails that represent the transmittal of and dissemination of the Mitsubishi Trade Secrets, a summary document prepared by Siemens describing in general detail the identity of Siemens' employees who received the Mitsubishi Trade Secrets and a one page summary describing the benchmarking of the Mitsubishi Trade Secrets into Siemens data bases.  Siemens has designated these materials as confidential.  Pursuant to the parties confidentiality agreement, Mitsubishi is required to seek

leave to seal materials designated as confidential pursuant to Local Rule 1.09.  These materials, which Mitsubishi refers to collectively as the "Siemens Confidential Designated Documents" have been the subject of conferral and are identified as follows:

**Transmittal emails:**   The Siemens Confidential Designated Documents consist of transmittal emails identified by the following bates labels:

> SIEM_ENER000001, SIEM_ENER000004, SIEM_ENER000008, SIEM_ENER000012, SIEM_ENER000015, SIEM_ENER000047, SIEM_ENER000052, SIEM_ENER000056, SIEM_ENER000057, SIEM_ENER000059, SIEM_ENER000061, SIEM_ENER000063. SIEM_ENER000067, SIEM_ENER000082, SIEM_ENER000103, SIEM_ENER000105, SIEM_ENER000107, SIEM_ENER000114, SIEM_ENER000117, SIEM_ENER000124, SIEM_ENER000126, SIEM_ENER000133, SIEM_ENER000138, SIEM_ENER000158, SIEM_ENER000181, SIEM_ENER000184, SIEM_ENER000205

**Attachments to correspondence:** The Siemens Confidential Designated Documents include attachments to letters sent by Siemens counsel on October 26, 2020, October 27, 2020 and November 27, 2020.  Specifically, Mitsubishi is identifying Attachment A to Siemens 10/26/20 letter, Attachment A to Siemens 10/27/20 letter and Attachment A to Siemens 11/27/20 letter.

### C.    The Exhibits Are Within the Ambit of 18 U.S.C § 1835

The exhibits at issue fall within the ambit of the statute.  The statute defines "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through

proper means by, another person who can obtain economic value from the disclosure or use of the information;

1.    <u>The Exhibits include trade secret information</u>

As asserted by Mitsubishi in its Verified Complaint and in the Declaration of Kent Rockaway in support of its Motion for Preliminary Injunction, these exhibits fall within the aforementioned statutory definition of trade secret.  The exhibits include pricing information, engineering specifications, economic data, analysis and evaluations of gas turbine temperatures, fuel consumption, heat rate, exhaust flow, and output, as well as plans, designs, drawings, specifications, weights, dimensions, bills of material, equipment test results, discounts, performance data, calculations, and other know-how—all of which constituted Trade Secrets. (Doc. 2-1, ¶ 18)

2.    <u>Mitsubishi has taken reasonable measures to keep the information secret.</u>

Mitsubishi has taken reasonable measures to keep the information secret.  Mitsubishi invests substantial time and money in safeguarding the Trade Secrets and otherwise confidential information. Mitsubishi takes reasonable steps to protect and maintain the secrecy of the confidential information and Trade Secrets and has taken significant measures to prevent it from becoming available to persons other than Mitsubishi personnel who require access to this information to perform their job duties in the furtherance of Mitsubishi's business.  (Doc. 2-1, ¶ 10)   For example, confidential information and Trade Secrets are only provided to those Mitsubishi employees on a need to know basis for Mitsubishi's business, or potential clients of Mitsubishi who have signed non-disclosure agreements. (Doc. 2-1, ¶ 10)  In no event does Mitsubishi share its confidential information or Trade Secrets with competitors.  In addition, Mitsubishi has established policies that:

#80582761_v1

(a)    prohibit Mitsubishi personnel from emailing confidential information/Trade Secrets to non-Mitsubishi personnel without adequate protections in place to maintain its secrecy such as a non-disclosure agreement;

(b)    prohibit the use of personal removable storage devices (e.g., USB thumb drives);

(c)    permit Mitsubishi personnel to review confidential information/Trade Secrets only on password protected, Mitsubishi-issued computers (i.e., Mitsubishi employees are not permitted to store confidential information on their personal computers); and

(d)    require reaching non-disclosure agreements before sharing the confidential information/Trade Secrets with potential clients in connection with proposals.

(Doc. 2-1, ¶ 11)

To protect the Trade Secrets from being publicly known,  Mitsubishi also requires personnel to review confidential information/Trade Secrets only on password protected, Mitsubishi-issued computers (i.e., Mitsubishi employees are not permitted to store confidential information on their personal computers); and requiring expansive non-disclosure agreements before sharing the confidential information/Trade Secrets with potential clients in connection with proposals.  (Doc. 2-1, ¶ 12)

Other measures Mitsubishi takes to protect its Trade Secrets include requiring Employees of Mitsubishi to sign confidentiality agreements, which, in part, provide that Mitsubishi's confidential information and Trade Secrets shall be kept confidential at all times.  (Doc. 2-1, ¶ 13)

3.    <u>The Information derives independent economic value from not being generally known or readily ascertainable by other persons who can obtain economic value from the disclosure.</u>

The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person

who can obtain economic value from the disclosure or use of the information. The industrial power generation industry is highly competitive. In this constricted and highly competitive market, one of Mitsubishi's most valuable assets are its confidential information and Trade Secrets. Mitsubishi's Trade Secrets allow it, among other things, to maintain a competitive edge in the market and to conduct business to serve its customers. The disclosure of Mitsubishi's confidential information and Trade Secrets to its competitors would put Mitsubishi at a great commercial disadvantage. The Trade Secrets afford Mitsubishi significant economic value because they are confidential, and provides Mitsubishi significant advantages over its competitors, Siemens and GE. (Doc. 2-1, ¶ 7) The possession of Mitsubishi's confidential information and Trade Secrets would give competitors an unfair economic advantage in developing, marketing, manufacturing, and selling competitive industrial power generation products and providing service of these products. (Doc. 2-1, ¶ 9)

Therefore it is imperative that the exhibits be kept under seal to prevent their disclosure.

**D.    The Duration of the Seal**

If the Court grants this Motion, Mitsubishi requests that the documents be sealed indefinitely, subject to further orders as may later be made with respect to confidentiality. Courts in this district have allowed for documents to be filed under seal for indeterminate amounts of time. *See*, *e.g.*, *Shamblin v. Obama for Am.*, 2014 WL 6611006, at *3 (M.D. Fla. Nov. 21, 2014) (granting motion to seal exhibits for an indefinite duration).

**E.    Mitsubishi's Interest In Keeping the Information Confidential Outweighs Any Public Interest in Access.**

The public has a common-law right of access to judicial proceedings, which includes the right to inspect and copy public records and court documents. *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001). However, the public's

constitutional right of access to court records has a more limited application in the context of civil litigation than it does in the context of criminal proceedings. *Id.* at 1310. Moreover, when it comes to trade secrets "the general public [has] little interest in the details of trade secrets" while, conversely, parties "have a strong and overriding interest in protecting trade secrets and their confidential business relations and ... could be damaged irreparably if [their] proprietary secrets were put in the public domain . . ." *Aetna, Inc. v. Fluegel*, 2007 WL 4573800, at *3 (Conn. Super. Ct. Nov. 27, 2007) Thus, the right of access "may be overcome by a showing of good cause, which requires 'balanc[ing] the asserted right of access against the other party's interest in keeping the information confidential." *Romero v. Drummond Co., Inc.*, 480 F.3d 1234, 1246 (11th Cir. 2005). Courts consider the following factors:

> (1) whether allowing access would impair court functions or harm legitimate privacy interests;
> (2) the degree and likelihood of injury if made public;
> (3) the reliability of the information;
> (4) whether there will be an opportunity to respond to the information;
> (5) whether the information concerns public officials or public concerns; and
> (6) the availability of a less onerous alternative to sealing the documents.

*Id.* These factors support the filing of the exhibits under seal.

    1.    <u>Allowing access would harm Mitsubishi's legitimate privacy interests and Mitsubishi would suffer significant harm if its trade secret information was made public.</u>

Mitsubishi has legitimate privacy interests in the exhibits at issue as they include Mitsubishi's Trade Secret information. It will suffer significant harm if that information is available to the public as Mitsubishi derives economic value from the fact that its Trade Secrets are not generally known to others. The availability of Mitsubishi's confidential information and Trade Secrets would give competitors an unfair economic advantage in developing, marketing,

manufacturing, and selling competitive industrial power generation products and providing service of these products.

2.      <u>The information is reliable</u>

The information is reliable as it consists of Mitsubishi confidential and proprietary financial and technical Trade Secret Data.   The documents will be the subject of sworn testimony at the evidentiary hearing during which any particular documents reliability can be weighed.

3.      <u>Siemens will have the opportunity to respond to the information.</u>

Siemens will have the opportunity to respond to the information as the exhibits will be introduced into evidence at the evidentiary hearing.   Therefore Siemens will be able to use the same exhibits as part of its examination of the witnesses.

4.      <u>The information does not concern public officials or public concerns</u>

The information does not concern public officials or public concerns but instead concerns Mitsubishi's trade secrets.   As previously noted, "the general public [has] little interest in the details of trade secrets" while, conversely, parties "have a strong and overriding interest in protecting trade secrets and their confidential business relations and ... could be damaged irreparably if [their] proprietary secrets were put in the public domain . . ." *Aetna, Inc.*, 2007 WL 4573800, at *3.

5.      <u>There is not a less onerous alternative to sealing the documents.</u>

There is not a less onerous alternative to sealing the documents so as to prevent their potential disclosure to the public and Mitsubishi's competitors.

### III.  <u>CONCLUSION</u>

WHEREFORE, based on the foregoing, Mitsubishi Hitachi Power Systems Americas, Inc., n/k/a Mitsubishi Power Americas, Inc. requests this Court seal the exhibits described in this motion that will be introduced into evidence at the evidentiary hearing to be held on December 3 2020.

### IV.  <u>CERTIFICATE OF GOOD FAITH CONFERENCE</u>

The undersigned hereby certifies that, pursuant to Middle District Local Rule 3.01(g), it has conferred with counsel for Siemens Energy, Inc. ("SEI") in a good faith effort to resolve the issues raised by this Motion.  Mitsubishi "is authorized to state that, solely for purposes of the motion for preliminary injunction and the upcoming evidentiary hearing on December 3, 2020, SEI does not object to the specific relief requested in Section III, titled Conclusion, of this Motion to the extent Mitsubishi asserts that the listed and described exhibits contain trade secrets under the Act.  However, SEI reserves the right to examine witnesses on the public nature of some of the information contained in the listed and described exhibits, and to challenge the trade secret nature of any and all of these exhibits in other stages of the proceedings after discovery and further investigation.  As reflected in its responsive papers to the motion for preliminary injunction, SEI focuses its opposition on the lack of imminent threat of irreparable harm and mootness due to SEI's remedial measures.  The absence of any specific objection to the relief requested in Section III of this Motion is not an admission that Mitsubishi's factual assertions are true and correct.  Indeed, SEI disputes Mitsubishi's characterization of many of the facts, including but not limited to the assertion that SEI "acknowledged misappropriation and sharing of Mitsubishi's Trade Secrets."  SEI reserves the right to challenge the filing or use of any exhibits to the extent that Mitsubishi seeks to use versions of documents produced by Dominion rather than Siemens."

Date:   December 1, 2020

Respectfully submitted,

*/s/ Ben W. Subin*
Ben W. Subin
Florida Bar No. 982776
David E. Cannella
Florida Bar No. 983837
Benjamin J. Robinson
Florida Bar No. 60426
Holland & Knight LLP
200 South Orange Avenue, Suite 2600
Orlando, Florida 32801
(p) 407-244-5127; (f) 407-244-5288
ben.subin@hklaw.com
david.cannella@hklaw.com
ben.robinson@hklaw.com

*Counsel for Plaintiff Mitsubishi Hitachi Power
Systems Americas, Inc. n/k/a Mitsubishi Power
Americas, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Ben Subin*
Ben W. Subin

21